We will hear argument first this morning in Case 21-418, Kennedy v. Bremerton Sch. Dist. Mr. Clement? Mr. Chief Justice, and may it please the Court, when Coach Kennedy took a knee at midfield after games to say a brief prayer of thanks, his expression was entirely his own. That private religious expression was doubly protected by the free exercise and free speech clauses. When the school district fired him for that fleeting religious exercise out of endorsement concerns, it not only violated the First Amendment, but it ignored a veritable wall of this Court's precedents that make clear that a school does not endorse private religious speech just because it fails to censor it. As much as the district would like to change the subject, the record is clear that Coach Kennedy was fired for that midfield prayer, not for any earlier practices. And the record is equally clear that the district's sole reason for its actions was out of endorsement concerns, not concerns for band members' safety or how many players joined the coach in the prayer. In fact, Coach Kennedy was disciplined for events at two games in particular, October 23rd and October 26th. At the first of those games, it is undisputed that no one joined the coach in his prayer. Nonetheless, that solo prayer was Exhibit A in his firing. Exhibit B was the October 26th game, when no players joined him in the prayer. Yet nonetheless, the district throughout this case, both contemporaneously and to the EEOC and in deposition, has confirmed that the sole driving force behind its actions has been avoiding endorsement. The Ninth Circuit held that the district's actions not only comply with the First Amendment, but are compelled by it. That decision is flatly inconsistent with this court's precedence. The Ninth Circuit's government speech holding ignores this court's statement in Garcetti to avoid overly broad job descriptions. And the Ninth Circuit's establishment clause holding fails to grasp a basic teaching of this court's cases that has been said over and over again and is simple enough for even young students to understand that the government does not endorse all private religious speech just because it takes place on the school side of the gates. I welcome the court's questions. Mr. Clement, just so I'm clear, are you pursuing below you had a free exercise claim and you had a free speech claim? Which are you pursuing? Are you pursuing both now or are you pursuing them separately or is this sort of a hybrid claim argument you're making? So, Justice Thomas, we are pursuing them both. They're both fully preserved in this court. But I do think you're right in the sense that this is a hybrid type case in which the free speech clause and the free exercise clause reinforce each other. And I think it directly reinforces how the court should approach the case. Because when a government acts not because it's trying to maintain discipline in the school or maintain order or avoid disruption, but it is taking action precisely because the speech is religious and the school fears endorsement concerns, that's a case where strict scrutiny applies and it's not just a case for ordinary pickering balancing. So, where does Garcetti fit in? It seems as though that's muddying the water a little bit because you would not normally think of a free exercise claim as being amenable to Garcetti. Well, I think that's a fair point, Justice Thomas. I guess if the statement really is the government's own speech, then I don't think you'd have the basis for either a free speech claim or a free exercise claim. It may be, though, that in deciding whether or not the coach's speech is his own speech or the government's speech, you might apply a slightly different test in the free exercise context than you would in the free speech case. But either way, I think we are comfortably on the private side of the Garcetti inquiry. Because the Garcetti inquiry asks whether this is part of the coach's job duties. Well, we know it's not a part of his job, especially since the school district didn't know anything about it initially and it objected to it, so it can't be a part of his job. Well, that's music to my ears, Justice Thomas. And I would say even beyond that, we know it's not part of his job duties for at least two other reasons. First of all, his job duty was not some all-encompassing responsibility for the players after the final whistle blew because the record is clear that he was able to have a private conversation, greet a spouse and do things like that. But how could you make a free exercise claim and say it's a part of his job? We're not. So we're saying this isn't part of his job, so it's private speech. And therefore, under free speech principles, it's subject to, in our view, ultimately because the government's action is religiously based, it's subject to strict scrutiny. But we'd also say because it's not part of his job, it's private religious activity that's protected by the free exercise laws. I have been trying to parse this out in a similar way to Justice Thomas, but let me just give you a certain number of hypotheticals. And tell me when it becomes private and when it's still public. A teacher begins each of her classes with a silent prayer and an audible prayer. Now, when I say begin, bell rings, students are coming in, they sit down, teacher says the prayer privately or publicly. Is that within her duties as a teacher? I would think so, Justice Sotomayor. Why? Because it's during instructional time, it's during a time where she has instructional duties. How about before the bell rings? Students are coming in, she's reading the Bible. She's reading it out loud. Before the bell. Is it the bell that makes it within the time or not within the time? Well, I would say the bell is what makes your first hypothetical a relatively straightforward one. As to your second hypothetical, because I think there's two things there. I think if the teacher were before the bell reading her Bible at her desk, either silently or barely audibly, that would be private speech, that would be protected. If before the bell, but while the students are all there, she's reading out loud to the class, I think that's kind of the edge case. So let's take it to the end of the class. Class, the students are getting up. It is part of everyday life that if students leave, they stop and they talk to the teacher. She gives them some answers to their questions about the lesson. But instead of doing that, instead of waiting for those questions, she decides, I'm going to say a prayer. Is that within her duties? Is that personal? Or is that still something that will be perceived as part of her workday? So, Justice Sotomayor, I think that's closer to the edge case. And I think what it would depend on, again, first of all, if after the bell rings she's reading the Bible, because she's free to do whatever she wants, and she chooses to read the Bible, and she does it either silently or... But she's not free to do everything she wants. She's required, as part of her duties, to be available to the students and answer their questions. Well, then it might be a situation where, in that hypothetical, where she's essentially supposed to be continuing to have some instructional obligations to the kids, and she's not free to text her spouse, check her email. Let's take that, okay? She's not free to do that, because it's personal. She could do it, but it's personal speech, not religious speech, to text her husband or to check the Internet. Could she be fired for texting her husband during school hours? Well, I think if I'm understanding the hypo right, if it's a neutral rule, doesn't single out religious expression? No, no neutral rule. If she does something that's private on office hours, this is her employer. Her employer says to her, don't do private things when you're working. And she does it anyway. Can she be fired? So that is a neutral rule, as you're explaining to me. I think that's important to my answer, so I just want to make sure that's common ground. It's a neutral rule that you can't do anything private. But why does it have to be a neutral rule? Meaning, and this is why I'm getting to this example. She's on duty. She's on duty in the classroom. And the duty is not from the beginning of the bell to the end of the bell. The duty is while she's in the classroom. So why can't an employer tell an employee what they're permitted to do, personal or otherwise, during that time? And I ask this question because I'm analogizing it to this situation. I found it odd in your brief that you just kept saying the coach wasn't on the field during the game. But I have a dozen or more statements by your coach telling and admitting that his duties as coach weren't just during the game. He had an obligation to remain behind for two hours after the game finished. That was part of his duties. He had a duty to make sure that he escorted all the players off the field. He had a duty to make sure the other team got off the field. He had a duty to do a post-game wrap-up, both with the players and the coach. He had a duty to clean up and to make sure that the gym was left in good order. So I guess what I'm asking is, if he had all these duties and your employer says to you, these are the duties that you have and that's all I want you to do, why can't it choose to say, and the one duty I don't want you to do is to do this one because you are an example to your players. You admit that that's part of your duties. If it's not part of his duties to set the example the school wants, why can't the school fire a coach who decides to put a Nazi swastika on their arm and go to the middle of the field and pray? If someone comes up and says, that's part of my religion, could the school say no to them? So Justice Sotomayor, I think there were maybe three different hypotheticals there, and I'm going to try to deal with them as best I can. If somebody wants to have sort of a Nazi emblem, but it's not religious... Assume it's religious. But if it's not religious... Assume it's religious. I'm happy to assume it's religious. If it's claimed to be religious, that might be one of the rare cases where you question the sincerity of the religious belief because I'm not really aware of that religion myself. But assuming it's a sincere religious belief, there's no basis to discriminate on the basis of religion. And so the school might have to address that through a neutral policy, avoiding disruption. And if it's a neutral policy and doesn't single it out because it's religious, then that's something that would be evaluated under Pickering. Mr. Clement, what if the activity on the field did not consist of this kneeling down briefly, but something more extensive, standing up on the 50-yard line, arms outstretched, engaging in audible prayer? Is your analysis and answer still the same? It's not exactly the same, Mr. Chief Justice. I think the difficulty with the sort of audible prayers or some of the practices that the coach candidly admitted he engaged in previously, where he's holding up the helmets for both teams and sort of talking to the players, if there's an instructional component to that that I think that a school district could say, that since you're engaged in instructional activity and that's the core of what coaches and teachers do, we're going to treat that as government speech. No, he's not speaking to the players, as in the example you gave, but he's praying to God. So if there's not an instructional component to it, if the players are doing their own thing in the end zone, for example, then I think it really becomes what the school is able to have a neutral rule. And this was part of my answer to another component of Justice Sotomayor's question, which is the school has a fair amount of flexibility to determine what the duties of the coach are. Here, they did not say that his duties were an all-encompassing supervisory role. And I suppose if the school district had one coach whose whole job was to watch those kids after the bell like a hawk and make sure they didn't get into any trouble, even a brief religious exercise by that individual might be inconsistent with their neutral job duties and a basis for the school to do something. But here, it's in the record, and I think undisputed, that the coach could do other things, other private things, of a comparable amount of time. Because this is a fleeting religious exercise. Even the school district described it as fleeting. But would tinkering apply, Mr. Clement, if in the Chief Justice's hypothetical, let's say he said the Our Father was arms outstretched, and it starts causing a lot of havoc in the stands, a lot of the things that your opponents, your friends on the other side say that happened, that the band members were being rushed, the head coach feared for his life. If his prayer of the Our Father caused that kind of chaos, would pickering apply? If they said for reasons of efficiency and school safety, we just can't have this? So if they came up with a neutral policy that tried to deal with that situation, I think you would test the neutral policy based on pickering. I think if they tried to adopt the neutral policy for the sole reason of stopping the Our Father, I think that's a case where you'd say, no, that's pretextual, and that's still going to be subject for scrutiny. But if I just get it on the table, but I also think if the hypothetical is that kind of audible prayer, you do have the argument at least that that would be instructional and might be a different case. One of my problems in this case is the parties seem to have different views of the facts. So I'd like to get this may be a case about facts and not really much about law. And that's why I wanted to try this. I'll list six facts that I got out of the record and just tell me if they're right or wrong. That's all. If you want to say they're wrong, I'll go back to it. If you want to say they're right, good, I don't have to go back to it. One, for a long time, Kennedy would go after the game, Coach Kennedy would go to the 50-yard line, and he spoke out loud a prayer of thanksgiving, and he allowed students to join him. Two, when the district learned about that, it wrote to him or told him, you are free to engage in religious activity, including prayer, but it has to be physically separate from student activity, and it has to be non-demonstrative. Okay, if they're involved, if the students are nearby. Three, his lawyers, Kennedy's lawyers, then sent him a letter that seemed less accommodating. It said, beginning on October 16th, Kennedy will continue his practice of saying audibly, just after the game, by himself, at the 50-yard line, an audible, verbal prayer, and students could come. And Kennedy said, I'm not going to stop my prayer because kids are around. Four. So, am I supposed to stop you when something's not quite right in my... Yeah, yeah, just to make note of that. I think it's important, if you look at the demand letter that was sent on October 14th... I'm about to do that. No, no, that's what you were just talking about. No, no, I'm not. This is before. I'm saying, oh, correct, you're right. So, in that October 14th letter, it didn't say that we want to pray with students around. It specifically said that the coach shouldn't have to flee from students if they independently and voluntarily come near him because the students also have First Amendment rights. Correct. But Kennedy, in his letters, said, I am not going to, in his deposition, I will not stop my prayer because there was kids around me. Yes, he said it. That's Joint Appendix, page 295. I'm not going to stop my prayer mid-prayer that I start by myself. All right, I'll read, I'll back and read that. I check it because I'm going to go back and read it. Four. He then advertised his plan to pray at the 50-yard line at the October 16th game, and the media all found out about it, made a big deal about it, and he was surrounded by players and a large number of spectators who rushed to the field. Well, and... Until October 16th. October 16th. Important to note that the only players that joined him on October 16th were players from the opposing team. Opposing team. Got it. Five. Afterwards, the district said to Kennedy, you cannot engage in demonstrative religious conduct while you are on duty for the district. Okay? But if it's not going to be perceived as district endorsement, we'll accommodate it. For example, pray privately, or inside the school building, or on the athletic facility somewhere, or in the press box. And you can do that before or after games. And the development of accommodation is an ongoing process, and we will discuss further accommodations. And the final thing, six, is Kennedy never answered that letter. Okay. He's got the six, but he's taken them in because there are a lot of them, and I'm sorry about that. Are they basically right with your exceptions? Well, and I was just about to add exception six, which is... Seven. Well, no, no. But on six, it's not in the record, because these kind of interactions wouldn't necessarily be in the record, but there were efforts by Kennedy's lawyer to negotiate with the school district, and they would not respond. And we pointed that out in a footnote in a reply at the cert stage. So this is not a situation where there is some asymmetry here, that they were wonderfully accommodating and we just refused to deal with them. There are lots of other facts that are in the record that I think are highly relevant here, including that no student joined him on the field on October 23rd, even though that's one of two specific incidents for which he was disciplined, that no players joined him on the 26th, which is the other game where he was specifically sort of signaled out for his being fired. It's also, I think, important to recognize that after the game on the 16th, the letter was sent on the 23rd. It didn't say anything about safety concerns, band member safety. It talked eight times about endorsement. And then at the next home game, the only other home game in the record here, the 23rd, because the school district made clear that there weren't supposed to be people on the field, they didn't have a replication of the events on the 16th. It's also true, and I think important... Sure, I just had one more thing, which is that there were a number of these games, you know, contemporaneously, right before then, where the record is clear that he did engage in these kind of prayers when the players were singing in the end zone, and many of them were at away games, and there was no rushing the field, no circus, no incidents. I take it from your earlier answers that you're not contesting the right of the school district to discipline Coach Kennedy if he had been praying during the official, if you will, post-game talk. I think that's right. We don't have to make an issue with that. So that's like if he were praying, if he were a math teacher and he prayed in math class, same if he's a coach and he prays during the post-game talk, that the school can discipline him for. That's right, because it would be government speech. Just briefly, why? Because it would be government speech. Well, I don't really quite know why that's the operative question. I mean, really, why? Why can the school discipline him? I'm going to just sort of suggest and find out whether you agree that if you look at our prayer cases, the idea of why the school can discipline him is that that puts a kind of undue pressure, a kind of coercion on students to participate in religious activities when they may not wish to, when their religion is different or when they have no religion. Is that correct? So, look, I think it's simpler than that, quite frankly. You see, I think a lot of this Garcetti stuff is just not getting to the heart of what we care about, what our cases have long cared about in thinking about these questions, which is coercion on students and having students feel that they have to join religious activities that they do not wish to join, that their parents do not wish them to join. So I do think it really is as simple as the government speech, but I also want to be clear, again, as we're talking about the record here, this is not a case where the government took action because of coercion concerns. The record is crystal clear that they were concerned about endorsement. Yeah, I mean, endorsement, coercion, I mean, you're requiring a lot of a school board to try to figure out exactly which box in the establishment clause to put this in. With all due respect, I don't think it's asking that much for a school district to understand what this court has said repeatedly and said that even young students can understand. Okay, assume that the school district had said the right things. They had said, we don't really like this because it is a form of pressure, a form of coercion. We're worried that the students will feel, he gets to put me into a football game or not. He gets to, you know, give me an A in math class or not. And this is a kind of coercion that's improper for 16-year-olds. So, Justice Kagan, in the hypothetical where the coach is giving the post-game talk, I think those kinds of concerns about real coercion may well be well placed. But when the coach is by himself at the midfield giving a 15-second fleeting prayer, those kinds, if you call that coercion, you are making an important category mistake. I see that point, so let me give you a hypothetical. So the hypothetical is you have a coach and he has historically been giving prayers in his post-game talk. And then the school says, don't do that. And let's say that the school uses the right words and says, don't do that because we think it poses a coercion problem. And he says, okay, I won't do that. But instead he says, you know what, I'm going to start the post-game talk a minute later than I usually do. And in the meantime, I'm going to pray and please, you know, join me if you're so moved. But what's a student to think at that point? I think in that hypothetical there well may be a coercion concern. But if instead the coach says, all right, I'm going to go to midfield. I'm going to do this at 15 seconds. I'm going to try to pick a time when most of the players are in the end zone doing something else. And if anybody asks whether they can join, I'm going to tell them it's a free country. You don't have to, but do what you want. That's this case. And that's not coercion that counts under the establishment clause. So is that the question of this case, whether the facts are my facts or your facts? That's one of the questions in this case. But why it matters, and honestly, I think the record's crystal clear on this. I mean, we have a record this time around. I don't think the joint appendix and the rest of the record is ambiguous on this point. But the reason the factual difference is important is because if you don't distinguish between the two situations, then you're leaving teachers and coaches in a position where there's no material room for their free exercise of religion or their free speech. And that's exactly what this court said is not the case in Tinker. And, again, the reason it gets back to government speech, at least in my view, is because one technique that the Ninth Circuit used to approve this is one of these excessively broad job descriptions. And I think with all due respect to Justice Sotomayor, her hypothetical built in this idea, if you say the job description of teachers and coaches is to be mentors, and if the mentors are religious, the students who depend on them for playing time and grades and all of the rest are going to want to curry favor and they're going to engage in their own religious practices or conform or at least feel pressure to do so. That's a recipe for no free speech rights at all. I do understand a claim that how adults respond to things is not often relevant. We don't have a heckler's veto in our First Amendment jurisprudence. But we have had it in our school prayers under the recognition of what Justice Kagan talked about, the fact that 16-year-olds can't be expected to be adults. What do I do with the facts that parents complain that their children wouldn't follow their directives, not because they wanted to pray but because they felt pressure to pray? What do I do with the fact that when the coach was, the school explicitly said, students don't have to come if they don't want. Many of them didn't. Some still did. But many of them didn't. And what do we do with the fact that a coach from another team was the one who brought this to the school's attention because your client asked him and his players to join in the prayers? Don't those facts suggest the very coercion that Justice Kagan was talking about? Justice Sotomayor, to the extent they suggest any coercion, it's only vis-à-vis the pre-September 17th practices that were discontinued as soon as there was a candid discussion between the coach and the school district. But, Mr. Clement, the problem I have is your client is the one who publicized this debate. He had a right to. But once he did and it created the disruption it did, why is the school stopped from saying, this activity on the center field of the 50-yard line has created a problem where people believe that our continuing to do this, students believe, permitting you to do this, is interfering with our work as a school? I don't understand why a school can't do that. Well, a school can't do that because it sounds an awful lot like they would be sort of either retaliating against his protected speech or at least saying it. No, they were willing to let him pray anywhere he wanted in the school. After the game, come back. He's the one who chose to publicize his prayer by doing it on the 50-yard line. He didn't do it on the side. He didn't just bow his head. He got on a knee at the very center of the field. I don't know of any other religion that requires you to get at the 50-yard line, the place where post-game victory speeches are given. What religion requires you to do it at that spot? So the coach's religion, and nobody's questioned the sincerity of his religious beliefs. He said he had a thank God. Briefly, Mr. Clement? His religious beliefs, he felt compelled to make his prayer there, and I don't think there's anything unusual about that. If a soccer player scores a goal, the soccer player will do a religious exercise, or Tim Tebow scores a touchdown, they do the religious exercise there. The spectator's watching it, but that's not what's driving the religious exercise. What's driving the religious exercise is that's where the event that the religious adherent is thankful for took place. Thank you. Justice Thomas, anything further? Justice Breyer? One quick question. From prior cases, the problem of prayer in school has been the fact that there are 54 different religions in the United States now, and so what, going back to the 18th century, 17th century, what we're worried about is maybe it's, here it was the Satanists, but I mean it could be the Catholics, Protestants, Jews, Shintos, Mohammedans, and one group thinks why this group is being favored by the school, the other one thinks what about this one, and so forth, so we have a kind of neutrality. Now, it's the same question. Right after the game, right before the bell rings in the morning, the teacher, the coach, says, let us pray, praise out loud, and students join, and indeed this one told all the press, so there were going to be a lot of people there, but leaving that out, this doesn't seem like a new problem. It just seems like a line drawing problem about 50-yard line just after the game when the school said, don't do it on the 50-yard line, do it 10 minutes later, and do you see what's bothering me, and am I right about how to see the case? So, I see what's bothering you, but I don't think you're right to perceive the case through that lens. There is a big difference between a teacher leading students in prayer out loud, and allowing a benevolent neutrality and tolerance for a variety of views. Obviously, the school district says it's fine to take a knee after the game, but it's not fine to turn to Mecca, or the Muslim student that scored and bowed towards Mecca is going to be disciplined, but not the Christian student that took a knee after scoring a touchdown. Those are problems. That's discrimination. But to allow individual religious exercise in the normal places, if you tell a kid that is about to kick the potential game-winning field goal, that they can't cross themselves on the field in front of 50,000 or 1,000, but what they can do, don't worry, you can go in, you can rush up to the press box, we'll put the whole thing on hold, you can do it in our prayer booth where nobody can see you, and then you can come down and kick the field goal. Nobody thinks that's sensible. And the one thing I would point out is the very fact that the accommodations that were offered by the school district were to leave the field and go somewhere else and do your prayer and come back demonstrates beyond all doubt that he did not have all-encompassing supervisory responsibilities after the game. Sure, he was on duty in a loose sense, but he was not on duty in a real sense, or they would not have given him those accommodations. Justice Alito? Justice Sotomayor, anything further? Justice Kagan? Justice Gorsuch? Mr. Clement, one of the difficulties of this case is getting one's hands around the district's rationale, and as I understood it, it was based on kind of our Lemon endorsement test, and you're arguing, as I hear you, that that was a mistaken test, and it is a mistaken way to think about what the establishment clause requires. You had a colloquy about coercion as an alternative, and I'd just like your thoughts on that subject generally. I appreciate the question. I don't think, you know, people are trying to dispute this record. I think it is very clear on what motivated the district, and it was endorsement, endorsement, endorsement, endorsement again. Not coercion. Not coercion. If you look at their first letter after the October 16th game, Joint Appendix page 90 to 95, there are eight references to endorsement or endorsing, zero references to either coercion or player safety. If you look at their letter to the EEOC, which is around Joint Appendix page 130, there are, again, eight references to endorsement, endorsing, no references to coercion. So it is clear what motivated their policy. As to what the right concern would be, I mean, I do think real coercion from government action is something that this court has historically looked to in the context of establishment clause cases, but as Justice Scalia pointed out in his good news concurrence and in other opinions, it is very important to distinguish between real coercion coming from the government and the kind of peer pressure, if you will, that comes from private individuals being able to engage in speech. And I think the record is clear here that we only have the latter going on here and not the former. It is certainly not what motivated the district because contemporaneously, when they put out a newsletter to their constituents, they said there is no evidence that any student was coerced here. So what do we do about that, though? Many school districts and municipalities around the country continue to operate on this endorsement idea, and there are certainly some strains of it in our case laws, you're familiar, dating back to Lemon. So I think the fact that school districts continue to make this mistake, even though you have said over and over and over again that tolerating private religious speech is not endorsement, is an excellent, excellent reason to be as emphatic as possible in overruling endorsement cases. If it requires formally overruling Lemon and the endorsement tests come from that, I think that would be very helpful. But what continues to happen is that there is overt discrimination on the basis of religion, as is evidenced in the record here, by school districts who aren't evil. It's just they're doing it out of misguided endorsement concerns, and I think the time has come to be as clear as possible to make clear that that's not a proper part of Establishment Clause analysis. If you would go back to the coercion part of your answer to Justice Gorsuch, if I understood you correctly, you were saying, well, real coercion is where the government does it. And I want to understand that. Are you suggesting that a teacher in a classroom can say, well, you can't charge me with coercion because he separates himself from the school district? That's where I think the Garcetti line comes in, because if it's government speech, instructional role, then that no matter what they say to try to distance themselves, the teacher and the coach can still be a source of coercion. But if it's really private, even though he says, you know, this isn't the school district speech. And even though everybody knows that, actually, I mean, there must be countless times when a coach in the post game talk or a teacher in math class where people would totally believe them if they said, I'm doing this as as just me. I'm not doing this because the school district says it. But for me, this is super important to me, this prayer. And I hope you'll join me now. That seems to me to be coercive of 16 year olds, regardless. If they know that it's him and not the school district, he is the one who's going to give me an A or not. I guess it just depends. I mean, if you're saying this, this happens in the middle of class, I might believe you. But if you just say, I mean, look, take a familiar example. It's Ash Wednesday. A teacher goes to morning mass, comes in with a big black mark on his or her forehead. Is that coercive? No, because nobody's asking the students to participate at that point. They don't have a choice of participating at that point. But it's a very popular teacher and they're going to have that teacher in the afternoon's class. And there's a noon mass that they might be able to get to and get their own black mark. And then there'll be favored students and that teacher is the one that I think we can draw lines like that. You know what's that? I think we can draw lines like that and know the difference between those two things. But know the difference when a teacher who has historically tried to bring prayer into a classroom setting says, you know what? You know, I understand that there are all these Supreme Court cases against me. So what we're going to do is we're going to have a little bit of a break, five minutes of a break. So we can all regroup and and I'll be praying during that time. So, Justice Kagan, obviously, there's going to be room in a jurisprudence for pretext going both ways. And I also think there ought to be room for understanding that in this area, given the current state of this court's jurisprudence, there are there's room for for mistakes on both parts. So I think it would be profoundly mistaken to say, well, another coach, Coach Kennedy Prime, he could engage in this exact same religious exercise. But because he engaged in this previous exercise and candidly cooperated with the district, we're going to say that there's some sort of like a taint of prior practice and he can't engage in the religious exercise. So I don't know. Pick up on Justice Kagan's and Justice Gorsuch's questions. The district said the sole reason it was doing this was to avoid establishment clause problems. Correct. Correct. And was specific to endorsement. OK. And then to pick up on Justice Gorsuch, the lemon endorsement test that has not been applied by this court in several decades in cases like Van Orden, Town of Greece, American Legion, at least I've said, I don't think there is such a test in our case law anymore. The lemon endorsement test. Correct. Sure. But it's a it's it's a stubborn it's a stubborn fruit. And I don't think just pushing a pencil through it has done the trick. I mean, you really have to slice it in half and make their individual opinions. But let's we haven't applied it in the cases. I take your point. But I think Justice Kagan's point is there's a whole separate body of cases involving schools. And so Angle Lee versus Weissman in Santa Fe and Santa Fe is the football case. And so that's the most relevant one here, I think. And the question here, I think, is what's different about this from an establishment clause perspective than the prayer over the loudspeaker, which I think was a key fact in Santa Fe? How would we distinguish Santa Fe from this case? So Santa Fe is readily distinguishable. It is an endorsement case. So you might want to be clear that at least to that extent, it's no longer good law. But here's it's distinguishable. The loudspeaker is a huge part of it. But if you'll remember the Santa Fe case, I mean, one of the issues is the school district argued, hey, this is a facial challenge to our policy. And under the policy, it's possible for the student to give a nonreligious solemnization. And so this can't possibly be invalid on its face. And the court's response to that argument was to focus on the state action, the government's own involvement in a majoritarian election for the opportunity to give the prayer over the loudspeaker. So as I reread Santa Fe, I was struck by how much of the court's analysis turned on the election aspect of the school's policy, which has no analog here whatsoever. But to give a concrete example, I do think if the coach goes to the loudspeaker after the game, there's a much stronger argument that that's government speech. And and also there's just to pick up on Justice Kagan's point, then you have the captive audience that seems to be at the heart of Engel, we versus Weissman and Santa Fe. And the question really is what's different here? You can answer that in any way you want. Yeah, but but but I think that it, you know, the loudspeaker sort of ties this audience back to the government speech and ties it all together. I think, you know, when when Mohammed Salah, you know, has a religious exercise after a goal at Anfield, the fact that the crowd is there is incidental. It's not a captive audience in that sense. It's not it's not he who brought them there. So I think it kind of comes back to government speech in that respect. And I think when the coach takes this 15 second fleeting prayer at the end of the game with no loudspeaker, barely audible, it's radically different from the use of the loudspeaker. And it's much similar to Mohammed Salah, Tim Tebow, all of those things. Or think about what happens when a player gets injured on the field. I mean, it's common practice at all levels of the game, public school, private school. You take a knee, the coach takes a knee, the players take a knee. Many of them presumably are praying for the player's health. Some of them are not. Some of them are have their own religious traditions. But none of that is coercion, not in the real sense. And none of it violates the establishment clause. What about the player who thinks if I don't participate in this, I won't start next week? Or the player thinks if I do participate in this, I will start next week. And the players wants to start. So that's that's where I think making a clear message that that's inappropriate, that this doesn't matter for those purposes. That's that's how you deal with those problems. How will you ferret that out? Because every player is trying to get on the good side of the coach. And every parent is worried about the coach exercising favoritism in terms of the starting lineup, playing time, recommendations for colleges, etc. I think the school district, if it has that concern, and I'm not saying it's not a legitimate concern, just makes it as clear that it's school policy, that nothing turns on that. But that concern, although legitimate, isn't even specific to religion. I mean, I agree with that. I mean, if the coach is always wearing a Packers jersey, I mean, there's there's there's an incentive for the for the for the players to follow on. And it's not just coaches, because for most kids, frankly, the teacher is going to be the avenue towards collegiate success, not not the coach. It's both. But but but that's why if you take that, if instead saying the way to deal with that is you punish if any coach or teacher does it, shame on them and they should be punished. And you make clear that that's not supposed to happen and can't happen in this school. I guess the problem at the heart of it is you're not going to know because the coach is probably not going to say anything. Like the reason I'm starting you is that you were you knelt at the 50 yard line. You're never going to know. And that that leads to the suspicions by parents. I think I'm just playing out what the other side is saying here, the suspicion by parents that the reason Johnny's starting and you're not is he was part of the prayer circle. And, you know, that's suspicions. I don't think you can get around. That's a real thing out there. And, you know, that's going to be a real thing in situations like this. I don't know how to deal with that, frankly, though. Well, if it's a real thing, then there's really as I see it, there's sort of two alternatives. Right. You can work really hard to dispel it or you can say, well, that's a possibility. It's not limited coaches. It's not limited to religion. So we're going to effectively overrule Tinker and say that, you know, if you're a teacher, you can't do anything sufficiently expressive that students could try to mimic it in a way that curry's favor. One last question. And you mentioned this. It's not just religious speech that would trigger issues. It's others. So to your argument that this is private speech and therefore Garcetti, how do you handle the hypothetical again of the coach who goes out and wants to infer all the political banner at the 50 yard line? Well, or wants to put on a political message at the 50 yard line after the game. So so if it's if the reason that the school district is acting is because of disruptive or even just because it's political speech and it wants to take action, that's Pickering. They can do that. So that those are sort of an easy case. I also think like flags are kind of another. They're fun hypos, but they're easy cases because those are kind of no reason to unfurl flag other than to communicate with your message, your audience. And that's not true of this kind of prayer. It may be very important to somebody to do it in the place where the activities took place. It may be that incidentally, there's an audience there, but it's nothing inherent in the event for it to be sort of shown off to the audience. And I don't think you really say that about unfurling a flag. Thank you, Justice. Let me pick up on that, Mr. Clement. This is, as Justice Thomas asked you at the beginning, both the free exercise and free speech claim. Who is he communicating to God? Like, where is this the speech? I think he is communicating to God. And so that would trigger the First Amendment protection under both the free speech clause and the free exercise. Well, I understand the free exercise part of it, but even if he's not communicating to an audience, so he's completely silent, he just takes the knee. That's protected speech, even if he's not trying to communicate to anyone around him, just to the Almighty. Absolutely. It's expressive conduct or speech. Second question is to this coercion point. Let's imagine that Coach Kennedy runs a Young Life group. And he has many players, you know, and many other kids in the school, but many of his players, because they really admired Coach Kennedy, come to his home for the Young Life meeting. And many of the concerns that Justice Kavanaugh is identifying are present. You know, a lot of the players come because they think they're going to get more playing time if they come and show up and participate in this Christian youth group. I take it your position would be that that's entirely private speech, and even if there's a coercive component to it, that the school can have nothing to say? Well, I think that if the school has a concern about that kind of activity, after school activity, wholly off the school grounds, I mean, I think the way, if it really had a concern with that, it could try to deal with it through some kind of neutral policy. It said, well, we're sufficiently concerned about that, we're not going to let any teachers have any kind of outside events at their house or something. Then I think that would be a neutral policy. Somebody could try to test whether that's consistent with Smith or whether Smith's good law, but those are all different issues. But I think, you know, another way that the school can deal with these kind of issues, if it's not pretextual and just designed to root out religion, is to have neutral rules that say, okay, we get it, there are some concerns. But the one thing I think that's clear from this court's cases is that you can't have a prophylactic rule that says, you know, there might be some problems. And so the way we're going to solve the problem is to forbid a lot of protected speech. I mean, Ashcroft against Free Speech Coalition, among other cases, says that that's verboten. And I guess I'm gathering from your response that you would treat that Young Life example as basically subject to the same kind of analysis as Justice Kagan's examples of, you know, a disclaimer before class, this is an instructional, maybe it's before the bell, like Justice Sotomayor asked you before, purely private speech, not endorsement, nobody could mistake it for government speech. And any coercion would be, you know, maybe it's there, maybe it's not, just as in the Young Life group, maybe it's there, maybe it's not. I think that's right. And again, if there's a lingering concern, the option I think that's still on the table is a neutral rule that sort of avoids those situations. Because again, I mean, it really, as you sort of articulate it, if there's a concern, it really isn't a concern that's specific to religion in any way, shape, or form. I mean, you can have the same thing for any after-school activity. If the idea is, well, you know, people are going to kind of curry favor with the teacher and participate in that, then maybe have a rule about it. But of course, you know, you can have that already, right? I mean, you know, I think you're going to get a better math grade if you go up for the math team. So at a certain point, the responsibilities of the school is to teach the important lesson that private speech is protected, even for teachers and coaches. Thank you. Thank you, Counsel. Mr. Caskey? Mr. Chief Justice, and may it please the Court, no one doubts that public school employees can have quiet prayers by themselves at work, even if students can see. If that were the issue, there wouldn't be a case here because the district allowed that. But that wasn't good enough for Mr. Kennedy. He insisted on audible prayers at the 50-yard line with students. He announced in the press that those prayers are how he helps these kids be better people. And after the district closed the field to the public, he expressly permitted legislators and others to join him. Under Garcetti, those are the functions of a coach, not a private citizen. But even if not, under Pickering, Kennedy's rights would still have to be balanced against the district's interest in controlling its events and messages, protecting the religious freedom rights of the students and their parents, and managing the workplace. Some of these kids were just 14 years old. Mr. Kennedy's actions pressured them to pray and also divided the coaching staff, sparked vitriol against school officials, and led to the field being stormed and students getting knocked down. When Mr. Kennedy repeatedly ignored sincere efforts to accommodate personal prayers, what was the district to do? If a math teacher knelt and said audible prayers in class just before the bell, the school district could act. Coaches have far more power and influence, especially at the time and place of those traditional post-game speeches. To win, Mr. Kennedy would need this court to whittle Garcetti to nothing, and toss Pickering aside, and disregard students' rights, and ignore the need to maintain control over school events. Doing any of that on Kennedy's hypothetical facts would be ill-advised. To do all of it would be extraordinary. I welcome the court's questions. Counsel, if the coach, instead of taking a knee for prayer, took a knee during the national anthem because of moral opposition to racism, how would your school district respond? Would that be a Garcetti, would that be government speech? Well, Justice Thomas, if, for instance, the coach goes to the center of the field in front of everyone during the national anthem, absolutely that is government speech, but on Mr. Kennedy's theory, it's private speech. How is that government speech? Would you explain that to me? Sure. In Garcetti, this court made clear that the test for government speech is a functional test, not a formalistic one, to determine whether the speech is pursuant to one's job. That has to entail looking at the manner, the time, and the place of the speech, and how reasonable observers would see it, whether they would view that as speech as a government employee. And so in the hypothetical that you just gave, that's the sort of thing, given that moment during the national anthem, in the center of the field, and making this public act and public statement, that would be regulable. But what if the school district, as it did here, objected to that conduct before it took place? How could that be government speech? Normally when I think of government speech, the government has a message, and someone is communicating that message. How would it be government speech if, as it's happened in this case, the government objected beforehand? A couple of responses, Your Honor. The first is that what the government speech test gets at is the recognition that school districts and other governmental entities have to be able to control their programs, and when they hire somebody to run that program, they have to make sure that it is their message that's being communicated. And under Mr. Kennedy's test, not only would so many things qualify as private, just because the job description doesn't say, gee, if you go out to the center of the field during the national anthem, you are allowed or not allowed to make political speeches, that becomes private, and it gets even worse for this reason. On Mr. Kennedy's theory, if the motivation for that act of protest against police misconduct is political, then it's subject to pickering, balancing, and yet if the motivation is religious, it gets strict scrutiny. That makes no sense, and it is also inconsistent with this Court's consistent holdings that political and religious speech have to be treated the same way. Political speech gets strict scrutiny in other contexts, but government employees are different. There has to be a balancing, and to have a different rule for religious speech would be impermissible viewpoint discrimination. Counselor, here this morning in your opening argument and in your brief as well, you focused a lot on the facts. Coach Kennedy publicizing the dispute, announcing in advance his plans, some of the consequences that came from that. What if all that were off the table? It's simply the coach going out to midfield, taking a knee, and that's it. No dispute about who's responsible for cutting off the negotiations, take out the media stuff. Would the school have any problem in that case, or would the case be just the same? Well, Your Honor, that is certainly a closer question. If there's no history, no practice, no expectations of the students, but if the prayer is still going on at the time and in the place of those critical post-game speeches and at that moment, we think that's government speech. Now, if I'm wrong about that, then there has to be pickering, balancing, and then the question is taking really seriously Mr. Kennedy's, in that case if it's private, free speech and free exercise rights, but also bearing in mind how this affects the religious freedom rights of the students. And all the other concerns, like the question whether this could be disruptive of the event, could it cause a stampede or not, all those things have to figure out, and that's why both Garcetti and Pickering are practical tests. They're functional tests that deal with the realities that school administrators and governmental entities have to face every day in dealing with potentially complicated problems. I guess my question is, trying to focus on the legal argument, if those facts were not the case, if nobody had complained, if there was no press conferences, there was no dispute, would your position be the same or would it be different? Both with respect to Garcetti and with respect to the Establishment Clause concern. Well, if, for instance, the coach is kneeling on the sideline or if the coach is going to that place in the center of the field, when the students are heading back to the locker room or the bus, like he did for a month after the district's September 17 letter, then that wouldn't be reasonably perceived as government speech and the district wouldn't have substantial interest in regulating it. But the situation here directly implicates the power and authority of the coach, which is awesome. The coach determines who makes varsity, who gets playing time, who gets recommended for college scholarships. The students know you have to stay in the good graces of the coach if you have those aspirations. And so coaches, even when coaches say, oh, there's an optional workout on Monday, Tuesday, and Wednesday afternoons after school, you can bet that to the students that's not really optional, and especially not if the coach has gone to the media and said, having daily optional workouts is how I make these kids better players or better people. Counsel, I appreciate a lot of what you just said there, but we have to analyze our Establishment Clause precedents first because I think the district court said that the district's sole reason for doing this was to avoid an Establishment Clause violation, right? That is what the district court said. That was incorrect, Your Honor. Let me just take it there for a second. On the Establishment Clause point, the Lemon endorsement test, I don't think that is a test anymore. We haven't applied that in two decades, and so I don't think that helps on the Establishment Clause side. On the schools cases, Santa Fe ultimately, I think, is the case, and Mr. Clement was saying this goes beyond Santa Fe in terms of extending the Establishment Clause because it's not over the public address system. It's not the same fax situation that we had in Santa Fe, where it was to everyone in the crowd by the school over the public address system. So we shouldn't, I think he's saying, shouldn't extend Santa Fe, which itself extended Lee v. Weissman, which extended Engel. We shouldn't extend it further to this situation. Can you respond to that? Certainly, Justice Kavanaugh. In the first instance, yes, this situation is different because this is the coach. That was a student speaker in Santa Fe, and that has to make all the difference in the world. It doesn't mean that a coach has no free speech or free exercise rights, but it does mean that the pressure to conform at that moment of those critical post-game speeches Wouldn't those cases suggest that there's a difference between the coach in the locker room? I got it there. The coach in the huddle, I got it there as well. But when players are dispersing after the game, I guess I'm not sure how it's that much different from Establishment Clause perspective than Justice Barrett's hypothetical about the coach who is part of a group that has meetings off campus. I guess I'm not sure from Establishment Clause purposes how those two things are distinct. Well, in the first instance, this wasn't after the students were dispersing. That was when Mr. Kennedy had prayers from September 17th through his demand letter on October 14th. And what that demand letter said is, I've had a practice that didn't substantially change for seven years, and I want to continue that. And he spent what's a page and a half in the joint appendix in that letter saying, and students have to be able to join there too. Take the 10-26, the last game, as an example. We don't even have to go to homecoming where the crowd stormed the field, but Mr. Kennedy there went out. Sorry to interrupt. This wasn't huddle up team, which is a common coach phrase. That wasn't this, right? No, but does the coach have to say that for the students to miss that? And there's something else going on too, which gets back in part to government speech and in part to the Religion Clause concerns,  is he, ahead of time, gave special permission to two legislators and some other people to come onto the field to have a prayer circle with him on the 50-yard line. It was fully visible to students, and then as part of the arrangement was to turn around and have one of those state legislators address the team, which he did. Let me ask you to give me your analysis of the following set of facts. Forget about all of the complicated facts in this case. A football game ends. The coach is not required at that point to go to the locker room with the students. It's not part of his duties at that time. He is allowed to remain on the field for a period of time. He is allowed to walk onto the field. He does that by himself. He goes to the 50-yard line, he kneels down, and he prays. He doesn't invite anybody to go with him, but he also doesn't tell people who are also permitted on the field to go away. And all of this is visible to people in the stands. Is that a violation of the ---- Can he be fired for engaging in those activities? Well, Your Honor, it's necessary to start with the question whether that's government speech, and it would seem, given the facts that you gave Justice Alito, not to be government speech. So then the question comes under Pickering balancing. And if the team, for instance, is not there so that there's not a fear of coercion, and if it doesn't cause material disruptions, then the district doesn't have a substantial interest in regulating it. Those are the only facts, okay? So under those circumstances, there would not be a violation of the First Amendment. Now, you're talking about this in relation to the free speech clause, but the petitioner also has a free exercise clause claim. So if on that set of facts the school district were to say, you can go out to the center of the field and you can kneel down to protest the Russian invasion of Ukraine, or make a statement about climate change, or about racial justice, or any other issue that is of interest to you, but you can't pray, would that be consistent with the free exercise clause? The school district doesn't have a substantial interest in discriminating, but it is also the case that the school district gets to script its event. So the question has to start with whether he's acting as a government official or not. I take it from the example that you gave, Justice Alito, that the players aren't around, there's not a concern about pressure, but it is the case that if the players were, for instance, the school district has ample authority, whether it's religious coercion, or political coercion, or social coercion to adopt any particular view. I take it your answer to that question is they couldn't discriminate based on the religious or secular motivation of what the coach did. Correct, but what's interesting about that is Mr. Kennedy's test requires different treatment for religious and secular speech, and that just as a practical matter doesn't make any sense. You know, this is an employment, you've talked about all sorts of facts, and it is complicated. Coach Kennedy did a lot of things over a period of time, the school district said a lot of things over a period of time, but it's an employment discrimination case. And what do we do in an employment discrimination case where the employee says, I was unlawfully fired? We look at the employer's reason for the action that was taken, and if the reason that is given is an unlawful reason, then the employee wins. We don't say, well, you know, he did all sorts of other things before the event that the school district or whatever the employer is, said was the reason for the termination. He did all sorts of other things, he could have been fired for all of that, all sorts of other things. We look at the reason that was given. What was the reason that you gave here? Although the reason in the last letter was about religion concerns, it isn't the case that the court looks only at the given reason. In fact, it's quite the opposite. This court made clear in St. Mary's v. Hicks and Reeves v. Sanderson that it's necessary to look at the whole record to determine whether an employment action was improper,  And here there was an enormous pile of evidence that the school district acted on other concerns, safety of the students, control of its program and message, and the worry about the storming of the field. Let me list just five places in the Joint Appendix for that as examples. In the Joint Appendix, page 51. I know you want to make this very complicated, but seriously, it's your argument that if the employer gives an unlawful reason that the employer can nevertheless win because the employer could have given all sorts of other lawful reasons for the action. We don't at all think that this was an unlawful reason under the Establishment Clause. We think that it was required. We think that at the very least the district had the discretion to take those concerns into account. But there are lots of reasons that an employment action letter might not include all the reasons that the district acted. For example, here the district over and over again in every one of its letters said, Come talk to us. We'd like to work this out. Tell us what you want. And the district might well or an employer might well think, I don't want to pile on because we really want to find a solution to this problem. And a solution to the problem of religious coercion would also solve all the other issues. And by the way, that gets to the fact that the district did specifically name coercion concerns, which gets to questions that Justice Gorsuch and Justice Kavanaugh said. There are a lot of reasons. Why are you shying away from, or maybe you're not, the simple reason of establishment? I think this is true, but tell me if it's not. A teacher is given a notice from 5 to 9 until 9.15 every morning. We want a current affairs event where the students can discuss anything. And they can discuss religion too. There's nothing wrong with discussing religion or its history or what it's about. But one thing you cannot do is actually pray. And the teacher prays, purposely, deliberately. There's nothing wrong with prayer. It might be a great thing. It is. But the district doesn't want prayer between 9 and 9.15 is all. Though every other thing can be discussed. Does that violate something in the constitution of the law? And why not? Absolutely not. It does not violate anything. All right, why not? Well, for a couple of reasons. I will start with the establishment clause, but I want to work backwards to the issue of government. I mean, in other words, you have no reason not to turn to the establishment clause. And the cases that you would cite would be what? Well, starting with Engel, Engel against Vitale. And, by the way, Pierce against Society of Sisters as well, because the court made clear there and consistently since then that parents have the right to determine the religious upbringing of their children. And government officials can't interpose themselves and interfere with that. One of your points is we don't have to reach all these complicated issues. We can simply say the question is whether, just after the game, on the 50-yard line, the coach praying is sufficiently like the teacher praying between 9 and 9.15 in the morning that there is an establishment clause problem and that is a legitimate reason for bringing in discipline when it's not followed. Now, if we don't agree with that, you're going to go to 10 other things. Okay, I've got this. Yes, and, Justice Breyer, this was in the particular context of that long history of his conduct and the expectation and the pressure on the students. But it's not audible to all the players, and so you're relying on it, I think, being visible here. Audible also, Your Honor. Not to all the players because they're not all there. They don't have to be there. It's not a team event in terms of a huddle locker room situation. You're relying on it being visible. And then the question is how far does that go? The coach does the sign of the cross right before the game. Could a school fire the coach for the sign of the cross right before the game? If the coach is doing it while not making himself the center of attention at the center of the field, it's perfectly fine. While the coach is standing, the team is out there for, let's say, a basketball game or football. Let's stick with football. Football game. Teams are out there, and the coach is visible to everyone and very publicly makes the sign of the cross. Can the school fire the coach for that? If the coach is addressing the team and that's the way he starts it, the district can act. But districts don't have an interest in firing people willy-nilly. Addressing the team loads the hypothetical. He is visible to everyone in the crowd and to the players, standing a little bit on the field from the sideline, as coaches do, and very visibly does the sign of the cross. The reason that both Garcetti and Pickering involve flexibility is to take account of the line drawing here. That one doesn't seem so hard if it is the coach not making himself the center of attention, not addressing the team. Then it would be permissible, and it's protected if it's not government speech. I don't know how we could write an opinion that would draw a line based on not making yourself the center of attention as the head coach of a game. What this court has said, what this court has made clear about government speech actually gives that line, which the court has made clear that the functional analysis requires, requires looking at the manner, the place, the time of the speech and how a reasonable observer would perceive it. Yes, that's not a categorical absolute, but for good reason, because the real practical problems on the ground that school districts and other government employers have to deal with don't lend themselves to absolutes, and they certainly don't lend themselves to absolutes where the very same conduct by an employee can be either subject to government speech or subject to balancing if it's political, but is sort of categorically private and protected by strict scrutiny if it's religious. Why doesn't Pickering apply to Justice Kavanaugh's crossing himself example? I guess let's imagine it's just a free exercise claim. Have we ever applied Pickering balancing? I don't think anybody, let's just posit that in Justice Kavanaugh's example, the coach visibly crosses himself, visible to everyone, but that no one would mistake that for government speech. It's quite clearly just the private devotional practice of the coach. Why would Pickering apply? Have we ever applied Pickering just to straight-up free exercise claims? No, but this court has made clear that that's the mode of analysis for all First Amendment claims. It's done it not just with the free speech clause, but also with the petition clause by way of example. And to draw a different line would yield bizarre, impossible results. Let me give a couple of examples of what that might mean. You know, suppose that an assistant district attorney objects to the DA's request for the death penalty in a case and so writes a letter to the editor complaining and calling the district attorney out for that. Now, on Mr. Kennedy's test, that would be a classic Pickering example if it's a political view or a social view, but it would be subject to strict scrutiny if the motivation for that same letter is religious. Suppose that everything about this case is exactly the same as it was in reality, with this one difference. When Coach Kennedy went out to the center of the field on these two occasions, all he did was to wave a Ukrainian flag. Would you have fired him? It's not a question of firing him. In fact, he was put on paid leave. Would you have done to him what you did to him here? Would you have treated that case differently? That's absolutely something that can and should be disciplined, because the school district doesn't want its event taken over for political purposes. Where is the school district rule that says that? The school district has to be able to manage its activities and events, and that's clear under the Supreme Court. What reason is there to believe that you would have treated that case the same way? Not only is there nothing to suggest that it wouldn't have, but it would be absurd to think that a teacher or coach could take over the biggest school event of the year and in front of the students be plumping for a political cause or agenda. The school district has to be able to say... What is there in your explanation for the adverse action that you took that would support doing whatever you did to Mr. Kennedy in that situation? Well, there was an entire course of conduct here, right? The school district sent Mr. Kennedy a letter on September 17th saying, you can pray, including where it's visible to students, just don't pray with and to the students. For a month, he was having prayers at the games and it wasn't a problem. Then he sent the letter on the 14th demanding to go back and do what I was doing before, which is audible prayers. Students have to be able to join. And then he went to the press and he said, this is how I make these kids better people. And then came the game on the 16th. The idea that the school district couldn't do something when a zoo was created on the field is unimaginable. Can a school district take adverse action against a coach or a teacher? Because the coach or the teacher on purely private time, not on school premises, not when coach or teacher is discharging any official duties, is very, very visibly religious. Posts all sorts of religious messages on YouTube. Maybe this coach is an ordained minister and preaches. And the school district says, this goes too far. This is not the kind of mentor we want for our students. Can the district do that? Usually no, but it's not an absolute. And that's why Pickering is flexible. Let me give an example for why that would be the case. Look, students views of what is official and what is compulsory. And your district came really close to the Ninth Circuit in its earlier opinion, thought that that was a justification for what the school district did. Kennedy's not a good mentor for the students. What the Ninth Circuit clarified in its second opinion, what it meant in its first. But the real point is that to students, whether the coach is acting as a coach doesn't turn on the niceties of government speech doctrine. Suppose that the coach on his personal Facebook page says, in my 20 years as a coach, I have never had a student do well or make varsity who doesn't pray with the team before every game. That's a situation that it's surely private, but it's also surely coercive. It raises establishment clause concerns and all sorts of other concerns. That's different from my example. There's quite an express statement that you better pray and agree with my religious beliefs or you're not going to get a starting position on the team. What that shows, though, is that there certainly can be private speech that puts improper pressure on students to conform religiously or otherwise, and that's why the test has to be practical and functional. There can't be this categorical. On Mr. Kennedy's view, that's not just private, but there's also strict scrutiny, and that would make an impossible standard for school districts to deal with these real problems. I don't really understand your answer. Suppose the coach has got all sorts of political signs on the front lawn of the coach's house. They fire him for that reason? No, but no one would view that as government speech, number one, and no one would view that as a message being conveyed to students, that they might benefit from or are supposed to go along with. No student could think that? No student could think that if I don't say things in class, write things in my papers that agree with the coach or the teacher, or I say something that's contrary to what this teacher feels really strongly, that's going to hurt me? No student could think that? The question isn't whether no student can think it. The question is whether a reasonable observer should think it. It's an objective test, and compare that situation with, for example, the teacher putting up those signs in the classroom. That shows that the school district could certainly be concerned about that pressure on the students, that they feel like if they don't voice the opinion that's up on the wall there, that they might be penalized for it, and the district can make the decision that is going to regulate that, which will require, on the one hand, if that is private, recognizing the very serious First Amendment interests of the employee, but also recognizing the need not to have material disruptions in class, the need to avoid coercing students to adopt a particular political or social view, or interjecting the dissension in the school that that may cause. Mr. Thomas, anything further? Just a minor question. Initially, I asked you about someone, the coach, taking a knee during the National Anthem, and you said that, of course, that could be regulated. Do you have any examples where, in fact, that has been done in your school district? That situation has never arisen, Justice Thomas, and that gets to the attempt to call this religious discrimination because the particular act the school district had to deal with happened to involve religious discrimination. Actually, what I'm talking about is I'm interested in something that we agree could be regulated and whether or not there has been disciplinary actions. So far as I'm aware, that situation hasn't presented itself, but it is also— It hasn't presented itself or it hasn't been addressed. No, it hasn't presented itself, Your Honor. There are certainly situations in any school district where there are things that warrant discipline, but there was nothing, so far as I am aware, and certainly nothing in the record to suggest that anything like that ever happened here. Justice Breyer? Justice Alito? Justice Sotomayor? Justice Dagan? Counsel, I just want to make sure I understand the school policy. Minor point, but on Joint Appendix 28, it appears that teachers are forbidden from either encouraging or discouraging private student prayer. Is that right? Yes, Justice. So the coach was forbidden from discouraging private student prayer. Absolutely. And then suppose—well, let me just ask you this on the Establishment Clause. Do you think the right question that we're supposed to ask is whether the activity was coercive of students? You mentioned coercion many times. Yes, both coercion and endorsement have mattered since Engel, but let me give some of the places that show coercion in the record. I understand you— Or, excuse me, the district expressing concerns about coercion, but please— Let me ask you a hypothetical, then, if you think both are relevant. Yes. Let's say this court in a case saw evidence that the school district was focused solely on Lemon and the endorsement test and not coercion. And suppose the court thought that Lemon had been buried. What then should we do if we thought coercion were the appropriate test that hadn't been applied by the school district or by the court below? Remand for the lower courts to decide that question. And here there would be plenty of basis to show the school district's contemporaneous and expressed concerns for coercion. That would not be a basis to decide for Mr. Kennedy this was on summary judgment. It would be—then there would be fact questions, presumably for trial, about what the coercion was. Why is it that the school district so emphasized Lemon? I understand your point that there might be bits in the record otherwise. But as Justice Kavanaugh has pointed out, this court for decades now has resisted attempts to rely on Lemon in cases like this. And it does seem like there's an awful lot of records suggesting reliance on Lemon. Well, the school district was following the precedents of this court that continue to be precedents and haven't changed. But again, it very much had in mind—and for instance, in its September 17th letter at JA44, it specifically mentions that the talks needed to be secular to avoid alienation of any team member. That's talking about coercion. The school district referred to indirect coercion as well in the question and answer document and in the earlier statement to the community at the times of the September 17th letter to Mr. Kennedy and the October 28th letter. Well, the October 22nd letter, for example, it does speak about how a reasonable observer might perceive government endorsement of religion, even though it had pretty clearly disavowed Mr. Kennedy's activities by that point. What do we do about that? Well, in the first instance, as I said earlier, this court has made clear that in employment cases, one never just looks—one has to look at the whole record. I'm talking about an Establishment Clause counsel. Yes, and the district had and expressed other Establishment Clause concerns as well as all of its other concerns, and those were substantial. The coach is an amazingly powerful figure with immense coercive authority. I think we appreciate that, as all teachers do, and we're concerned about implicit coercion as well as explicit coercion. For lots of things, to get a good grade, you maybe feel like you have to participate in after-school activities or write an essay in a way that you think will appeal to the teacher's sensibilities or even politics sometimes, but that's not really my question. My question is, if we thought that the school district misunderstood the Establishment Clause teachings of this court, what should we do? Well, we still think that two things should—that the case, at that point, should be remanded because of the contemporaneous evidence of coercion and also all the other reasons that the district acted. If we think the other reasons the district acted are post hoc rationalizations that weren't presented below, or at least the district court found the sole reason was this Establishment Clause reason, what do we do about that? This was on summary judgment. The district court made what Mr. Kennedy's reply brief calls a factual finding. At a time when a factual finding is improper, there was plenty of record evidence of all the other reasons that the district acted and expressions either to Mr. Kennedy or to the community of concerns, and really, how could a district not be concerned about the zoo that was created on the field and students getting knocked over on the 16th, or having an organized prayer circle with state legislators who were addressing the kids on the 26th? These are the things that—the superintendent's amicus brief describes all the concerns that school administrators have to deal with in the school context. So the district court that ruled in the district's favor was mistaken when the district court found it was the sole reason? It wasn't mistaken for this reason. The Establishment Clause concerns in the way that the district court ruled in favor of the district was correct. If this court disagrees, then it isn't a basis to grant summary judgment for Mr. Kennedy because at that point, all factual inferences on summary judgment have to be drawn in the favor of the school district, which means it certainly isn't possible to just ignore all the record evidence. That's what would create fact questions requiring trial. Thank you. Is Lemon in this case? I mean, do we have to decide Lemon? The reason I ask, honestly, is because if you see Lemon, despite its imperfections, as an effort to take from other cases and the first part of the First Amendment, establishment is there first, an effort to prevent the country from becoming more divisive, certainly an effort that remains valid, to prevent it from being more divisive there on the basis of religion. Now, if that's reconsidered, you've read a lot on this. How many cases will we be calling into question if that part of it is reconsidered? That would seem not only to call into question, I don't even know how many cases since Lemon, but also the cases before. Before and after on the theme of preventing division on the basis of religion. Yes. That would certainly apply to, I think, at least all the school cases that the court has had. And I want to say something. I think that that's particularly pertinent because if the court looks, for instance, at the amicus brief of the members of the Bremerton community and what dissension it caused there, or look at the amicus brief of the East Brunswick school district personnel for the immense, horrible divisions and attacks that were caused there, or look at the footnote in Santa Fe where the court described the need of the district court to order people to stop trying to find out who the Catholic and Mormon families in that case, who were pseudonymous plaintiffs, to figure out who they are because of the harassment risks. So all those things matter, and I think it factors into every case, not to the same degree, but in schools it figures overwhelmingly, both in this court's cases and in the lower court's cases. Would it be overruling Lemon not to apply it since we haven't applied it in, I don't know, 20 or 30 years? We've been asked too many times, and we haven't done it in 20 or 30 years. It wouldn't be overruling. It would be doing exactly what we've been doing, right? Yes, but here what then that would mean is that the court should still be looking at coercion. We agree on that. Justice Kavanaugh. Just to follow up on that, my understanding of what you're saying here is that the Establishment Clause rationale was based on two distinct concerns, one endorsement, the other coercion. Is that accurate? Yes, although they are related. Okay, and on endorsement, as Justice Gorsuch says, we have not used endorsement in Van Orden, town of Greece, American Legion in a long time. So let's put that to the side for the moment, and I take your arguments about that. But on coercion, and just to follow up on the endorsement point, we did not apply Lemon in Lee v. Weissman, for example, the school's case that extended Engle to graduation prayer. So that didn't happen there. On the coercion side, there are different forms of coercion, as you've been talking about. You are compelled to say the prayer. That's not happening here. You're compelled to be president at an event where a prayer will be spoken. That is Engle. That is Lee v. Weissman. That is Santa Fe. But I think you're not saying that here either. You're saying there's kind of an implicit peer pressure, subtle coercion, implicit coercion. If I'm wrong about that, tell me. But that seems a different concern than the Lee v. Weissman, Engle, Santa Fe concern, and seems to run into the line-drawing problems that you and I were discussing earlier. So whatever you want to say in response to that. The term that this court used in Engle was indirect coercion. And this court very much said that in the public schools, indirect coercion matters too. Indirect coercion of students, I believe it said, of members of minority faiths to conform to a religious practice, is an establishment clause violation. That was not, if you don't join the prayer, you'll be off the team. That was the sort of situation where students can reasonably understand, and here very much students and parents understood, that you have to go along to get along. That's what it means to play football. To determine otherwise, to say that that isn't coercion, would require getting rid of cases all the way back to Engle and Schempp. And it would also put a serious deadline. I'm going to stop you there and challenge you on that. I don't see why the court couldn't say, and I'm not saying this is what we should do, just to put on the line-drawing, Engle, Lee v. Weissman, Santa Fe all remain in place. And Santa Fe applies, you know, logically to locker room or huddle speech. But we're not going to extend Santa Fe to something beyond that, really for the line-drawing reasons. The sign of the cross example, we had a discussion about that, and there would be many other hypotheticals. We just can't have the center of the attention be the line for establishment clause purposes, for example. The line that this court drew in Garcetti for government speech would solve the problem completely without any need to get to any of these questions because this was government speech. Otherwise, it shouldn't be necessary to decide conclusively an establishment clause question, though we think it is easy and clear under Santa Fe and Lee and Engle and Pierce v. Society of Sisters as a free exercise case pointing the same direction, because of the fact that under Pickering, the analysis takes very seriously the employees' free speech and free exercise rights, but it also takes account of everyone else's free exercise rights, the students and their parents, and all the necessary concerns about managing an event and everything else. On Mr. Kennedy's test, the court would ignore all of that. Nobody's religious freedom rights count except for the employees. That's an exceedingly peculiar result for a context that is a government employee who is hired to and charged with teaching and educating students. Thank you. Justice Barrett? I just want to clarify one thing about your argument related to that last point. If we disagree with you that this was government speech, so if we think this was private speech, we don't even get into the establishment clause because there's no state action, right? So we're not asking these questions about coercion for purposes of discerning whether there was an establishment clause violation, but we would be merely doing the Pickering analysis, which arguably might bring in things that Justice Gorsuch said. Let's assume we think some of those were post hoc rationalizations. We would need to get into all of that because we wouldn't be doing a straight up establishment clause coercive analysis. Well, the place to start is certainly the right frame of analysis is Pickering, but it isn't and we think can't be correct that there's no situation in which conduct that is deemed private under Garcetti by a school official is not an establishment clause violation, like the example that I gave to, I believe it was Justice Alito, about the coach who posts on the Facebook. I've never seen anybody who makes... That's state action? No, I'm saying that it isn't and yet it still poses an establishment clause problem of coercion. Because it would be government speech? No. But where's the state action? I mean, I see that there's coercion, but you could have coercion from all kinds of private sources. Where's the state action there? There shouldn't need to be state action for an establishment clause violation, even though it would be rare when one would have a violation without state action. Here, of course, there is state action, not only because he's a public employee performing his duties in a place and time where only he can and in a way that the students expected that to be, but also the school district has conferred authority on him, which everybody there knows. All that being said, though, we think the real point is that not only does it not need to be, not necessarily have to be functioning as a government employee at the time of the speech for it to raise establishment clause concerns, but it also raises all sorts of other concerns that under pickering the school district has to be able to address also. I get your pickering argument. I just didn't understand how there could be the establishment clause violation absent state action. But thank you for answering. Thank you, counsel. Rebuttal, Mr. Clement? Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, in terms of the correct test. Don't think the correct test when the government explicitly discriminates on the basis of religion is pickering. Religion is different. In the context of free speech, we're used to saying, well, if you just spoke over there, you had alternative methods of communication, time, place, and manner, there's some flexibility on that. That doesn't happen in religion because it's a compelled, sincere religious belief. If you tell a Muslim if they could just reorient themselves in the other direction, you're denying them their religious exercise. You need a test that is fit for religion cases and strict scrutiny provides that. If you want to give courts and district courts, rather school districts, guidance, the last thing you should do is replace jurisprudence that's becoming clearer and could be made clear in this case about discrimination against religion and the establishment clause and replace it with pickering. Balancing test doesn't provide guidance. The only thing worse than pickering, I suppose, would be a center of attention test. And that doesn't actually capture the real-world examples anyways. Right after Mohammad Salah scores the goal, he is, of course, the center of attention and he engages in a religious exercise. Right after Tim Tebow scores the touchdown, he's absolutely the center of attention, yet he engages in a religious exercise. It's private, it's permissible, and the government can't stop it. Second, in terms of Santa Fe, we've discussed this a bunch, but my friend on the other side does say, well, wait, this is worse, this is coach speech, not student speech. But you can't strip away all the context of Santa Fe. If everything else were the same, sure, the fact that it was coach speech would be worse, but it's not all the same. That case, the student was using the loudspeaker as the winner of a majoritarian election to be the designated spokesperson for the school. This case, it's the coach engaged in his private religious exercise. He happens to pick that point at the center of the field. He's actually not the center of attention if you look at the videos which are in the record, because there's lots of other activity going on, but that's his religious exercise, it's protected. Now, third, the record here, I mean, people seem like they dispute everything, but the record speaks for itself on this case. There are three games that are particularly relevant. The 16th, the homecoming game. That's what my friends describe as the circus, media circus, people coming onto the field. Well, there was a letter sent in response to that game in particular. It's a joint appendix, pages 90 to 95. It uses the phrase endorse and endorsing and raises endorsement concerns eight times. It talks about safety concerns zero times. It talks about coercion concerns zero times. That's the 16th. Then, by the 23rd, that's a game that is one of the two games on which the actual discipline turns. That's a prayer where no one, no one joins the coach in his prayer. The 26th is then the next home game. They have a much better security system that time. They've addressed that pretextual problem, and there's a prayer. No prayer, no player joins from either team on the 26th, yet the 23rd and the 26th are the prayers where he's disciplined. He was not disciplined for having a state legislator on the field. That's simply not what happened in this case. And, again, the record speaks for itself, not just contemporaneously. As I said, the score in the letter sent after the 16th game is eight to zero, endorsement eight, other concerns zero. But then when they lawyer up and have their lawyer send a letter to the EEOC at pages joint appendix 132 to 142, what concern do they express as their stated sole driving consideration? It is, again, endorsement eight to zero, eight mentions of endorsement. Nothing else is mentioned. So I'll finish with this point. Please do not remand to the Ninth Circuit for an application of the coercion test. There's no evidence of coercion contemporaneously. Joint appendix 105, the school itself stressed no evidence of actual coercion. The only evidence that showed up later was a couple of parents complaining about their students who had to turn their back on the team or separate themselves from team activity, obviously directed at the pre-September 17th activity that's no longer an issue in the case. There's no evidence of coercion in this record. But worse still, my client has already waited six years to get his job back. And if you imagine the parallel for this is a race case where the lower courts, both lower courts said the sole reason the government acted was because of race. But yet we think it's okay because there's this compelling interest. If this court took that case up and said there's nothing to the compelling interest, it wouldn't send it back down to see if there was some other reason when the courts had already found the sole basis for the action was on the basis of race. Here the record is clear. Two courts that didn't agree with much of what we said, said the sole basis for the government's actions here were religion. That is not something that should stand. Thank you. Thank you, counsel. The case is submitted.